IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

        Case No. 09-10097-01-JTM

KARLA KAY AIKMAN,

        Defendant.

MEMORANDUM AND ORDER

This matter is before the court on the defendant Karla Kay Aikman's Motion to Suppress. On July 21, 2009, Senior Special Agent Kevin Campbell, of the Kansas Bureau of Investigation (KBI), applied for search warrants for three residences in Natoma, Kansas: 816 6th Street, 916 Hachmeister, and 919 Hachmeister. The motion to suppress concerns only the evidence found at 919 Hachmeister.

The parties presented evidence at a hearing held January 25, 2010. Thereafter, defendant Aikman moved for leave to file a supplement memorandum. Aikman's motion to supplement is granted.

Campbell presented the affidavit, along with the application for the search warrant for 919 Hachmeister, to Kansas State District Court Judge Thomas L. Toepfer, who sits in the 23rd Judicial

District. The affidavit submitted to Judge Toepfer was a five-page document which erroneously omitted one of the pages Campbell had prepared.[1]

The affidavit in support of the search warrant explained that on July 10, 2009, Special Agent Mike Lind, who was working undercover, met with Christina Terry and Derek Jones to discuss a methamphetamine purchase. SA Lind gave Jones $650 to purchase one eighth of an ounce of methamphetamine.

On July 20, 2009, SA Lind met again with Jones and gave him $1100 to purchase methamphetamine. A surveillance team followed Jones to Plainville, Kansas where he picked up Derek Elliot. The surveillance team then followed Jones and Elliot to 916 Hachmeister in Natoma, Kansas. Elliot spent a few minutes at 916 Hachmeister, walked to 816 6th Street, where the report states that defendant Aikman lives.

Elliot left the Aikman house after a few minutes and got back in Jones' pickup truck. Jones later met Lind, and gave him several ounces of white powder. Lind knew it was not methamphetamine, and stated "he was getting ripped off."

Jones and Elliot were arrested. Elliot told officers that every time he had purchased methamphetamine for Lind, Aikman had sold it to him at either 816 6th Street or 919 Hachmeister. He also said that Aikman told him that she was going to be driving her green Subaru to Newton, Kansas soon to pick up more methamphetamine. Campbell stated in the affidavit that he knew Aikman had a green Subaru and knew its license number. Another police officer told Campbell the

---

[1] At the hearing on Aikman's motion, Campbell testified that after the search warrant his computer crashed, and he has been unable to recover the original affidavit.

green Subaru had been on the street next to the residence at 816 6th Street, but was gone later in the evening.

In addition to reporting buying drugs from Aikman at 816 6th Street and 919 Hachmeister, Elliot also told Campbell that he had personally seen Aikman's son, Kyle Kruse, using drugs at a third residence, 916 Hachmeister, which is just across the street from the residence at 919 Hachmeister.

Elliot told officers that he knew that the white powder he purchased with the $1100 was not methamphetamine, but he did not say anything to Aikman because he was scared of her.

Campbell also noted in the affidavit that he had interviewed Jeremy Stahl, who had been arrested for selling methamphetamine one month earlier. Stahl told Campbell that Aikman had sold him methamphetamine on several occasions, from both 919 Hachmeister and 816 6th Street location.

On July 22, 2009, agents of the KBI and local law enforcement officers executed the search warrant for 919 Hachmeister in Natoma, Kansas. Officers approached the residence and knocked several times. No one answered the door. Officers then entered the residence, and announced their presence as they moved through the residence. When the officers entered an upstairs bedroom, they observed video monitors with live feed from cameras placed outside the residence. At the same time, other officers were clearing the basement area and came across a closed door. The officers attempted to open the door, but the defendant was pushing on the door from the other side. Finally, officers ultimately forced the door open and took the defendant into custody.

In searching the basement room where the defendant was found, officers discovered 63.79 grams of 80 percent pure methamphetamine, an unopened one pound container of MSM (a white powder used to "cut" methamphetamine for distribution), a sifter, and digital scales. Several

containers with false bottoms were also found inside the residence and inside the defendant's green Subaru parked on the front lawn area of the residence.

**Conclusions of Law**

**I. Probable Cause for Warrant**

The Fourth Amendment prohibits "unreasonable searches," and warrants must issue only upon "probable cause." U.S. Const. Amend. IV. The judge's task in determining whether a search warrant is supported by probable cause "'is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause requires "more than mere suspicion." *United States v. Danhauer*, 229 F.3d 1002, 1005-06 (10th Cir. 2000). Furthermore, there must be a nexus between the suspected activity and the place to be searched. *Id*. at 1006. "An affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *Id*.

In order to determine if a warrant is supported by probable cause, a reviewing court is to assess the accompanying affidavits based on the totality of the circumstances and whether the judge[2]

---

[2] Probable cause is to be determined by a "neutral and detached magistrate," using the term "magistrate" to mean one who is legally empowered to make the determination. Because the defendant has raised an issue concerning the judge's authority here, and because the judge is a state district judge and not a magistrate judge, this Order will use the term "judge" not only to avoid confusion, but also for factual acccuracy.

had a "substantial basis" for his or her determination. *United States v. Harris*, 369 F.3d 1157, 1165 (10th Cir. 2004); *Danhauer*, 229 F.3d at 1006. The determination of probable cause by the issuing magistrate is to be given great deference. *Artez*, 389 F.3d at 1111. Moreover, the Supreme Court has "expressed a strong preference for warrants and declared that 'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.'" *United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *United States v. Ventresca*, 380 U.S. 102, 106 (1965)).

A totality of the circumstances test is also applied when determining whether information from an informant can establish probable cause. *Artez*, 389 F.3d at 1111. An informant's "'veracity, reliability and basis of knowledge are all highly relevant in determining the value of his report.'" *Id.* (quoting *Gates*, 462 U.S. at 230). However, if there is "sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *Danhauer*, 229 F.3d at 1006. Moreover, in considering the totality of the circumstances, the court decides if the factors establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009) (citations and internal quotations omitted). "Thus, a deficiency in one factor may be compensated for by a strong showing of another or by other indicia of reliability." *Id.*

Aikman argues that there is not a sufficient nexus between the specified criminal activity and the place to be searched because the only connection to 919 Hachmeister were the statements of Elliot and Stahl after they were arrested, and the surveillance team did not monitor a purchase of methamphetamine from that location. (Doc. 55 at 6-7.) She stresses the fact that the affidavit submitted in support of the warrant had a page missing, speculates that Elliot was the party who supplied the false methamphetamine to Lind, that the police surveillance saw Elliot go only to the

5

house on 6th Street, not the one on Hachmeister, and that the affidavit refers to the house at 816 6th Street as the place "where Aikman lives" but omitted any reference to land records or similar information to support the statement. (*Id*. at 4-5.)

The court finds that the court properly authorized the warrant as having been based on probable cause. Campbell points out in the affidavit that through his training and experience he had a belief the defendant was selling drugs out of both 919 Hachmeister and 816 6th Street in an effort to confuse law enforcement as to her place of business. The agent's expert opinion is an important factor for a judge in reviewing a warrant application. *United States v. Fama*, 758 F.2d 834, 838 (2nd Cir. 1985). Thus, a prudent person could believe that a search would uncover evidence of criminal activity. *Danhauer*, 229 F.3d at 1006.

Neither is a a page missing from the affidavit fatal, as the remainder of the affidavit supports a probable cause finding. The government produced information from two named informants, both of whom told law enforcement that Aikman was selling methamphetamine from both the house at 816 6th Street and the house at 919 Hachmeister.

The fact that both informants were known to law enforcement is important because a known informant's reputation can be assessed and that individual held responsible if the information turns out to be false. *See Adams v. Williams*, 407 U.S. 143, 146-47 (1972). Next, the surveillance team followed Elliot and watched him purchase the white powder. The government argues that a controlled purchase from the defendant's house can be sufficient independent corroboration. *Artez*, 389 F.3d at 1112. The surveillance team also confirmed what Elliot told them about the defendant owning a green Subaru and leaving later to go to Newton to purchase more methamphetamine. (Doc. 59 at 4.) In addition, information from a second informant assists in corroboration. *Artez*, 389 F.3d

at 1114. The agents had information from both Elliot and Stahl that they purchased methamphetamine at both the 816 6th Street and 919 Hachmeister locations. They admitted to being involved in criminal activity with the defendan. "[A]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility-sufficient at least to support a finding of probable cause." *United States v. Harris*, 403 U.S. 573,583 (1971). The surveillance of Elliot and Jones also corroborated Stahl's statements about the defendant's illegal activity, since they were made shortly before the controlled purchases and surveillance took place.

The government provided sufficient information to find that the informants' veracity, along with the corroboration by the surveillance team, reliability and basis of knowledge demonstrated probable cause to believe that evidence of criminal activity would be found in the cited residences. Even though the confirmation that the defendant owns a green Subaru and she left later that evening is not sufficient corroboration by itself; however, there was enough other sufficient independent corroboration by the surveillance team. *See United States v. Tuter*, 240 F .3d 1292, 1297 (10th Cir. 2001). Furthermore, even if the informants' motives are questionable since they were under arrest when they gave the information, the explicit and detailed description of the alleged wrong doing by the defendant were observed first-hand giving the information greater weight than it might otherwise. *Gates*, 462 U.S. at 234.

Aikman stresses that the powder given to Lind after the controlled buy was not in fact methamphetamine, and suggests Elliot was trying to rip off Lind. But both Elliot and Stahl separately informed law enforcement that Aikman was selling methamphetamine out of both houses. Further, Elliot only produced the powder after first going into Aikman's house. There is no indication that Elliot knew he was under surveillance at that time. Aikman seems to suggest that if

7

Elliot suspected surveillance, he might have been tempted to engage in the charade of attempting to contact Aikman. That suggestion is completely without support. The information set out in the affidavit, both as to the participants and the events, would lead a neutral and detached tribunal to reasonably conclude that Elliot did indeed receive the substance in the way he described to Campbell.

Aikman challenges application of *Tuter*, which the government also cites, noting the *Tuter* court found the affidavit insufficient and suppressed the seized evidence. But it is not *Tuter*'s outcome which is relevant here. The government cites that case for the limited proposition that law enforcement officers' "first hand" observations may be used to buttress an otherwise weak affidavit. The fact that the court in *Tuter* ultimately suppressed carries little weight here since the cases are so dissimilar. In *Tuter*, the affidavit was premised on a single, anonymous telephone call. 240 F.3d at 1297. Further, there was nothing predictive in this anonymous tip which later police observation corroborated. Here, in contrast, there are two named informants, one of whom participated in a controlled buy. Further, the informant specifically supplied some predictive information (Aikman would be leaving town in her green Subaru in order to get more methamphetamine) which police observation.

During the hearing and in her supplemental brief, Aikman argues that a comparison of the affidavit with Campbell's notes suggest that affidavit was false. Specifically, he stresses that the notes do not mention Elliot having said he had bought methamphetamines at both houses and thus the affidavit "overstated what Mr. Elliot actually said." (Dkt. 67-1, at 2). However, that Campbell's notes are less complete than the affidavit does not compel the court to conclude that Campbell's

8

affidavit is false in that regard. Campbell testified at the hearing that the affidavit was correct and the court finds that his testimony credible.

Finally, Aikman argues in her Supplemental Brief that the arrest of Aikman "accelerated their plans," forcing law enforcement to obtain the warrants earlier than they planned, while they were "still trying to build a case against Ms. Aikman." (*Id.*) Unquestionably, more information is always desirable, but that begs the question presented. The only issue the court is deciding here is whether the information supplied in the affidavit demonstrated probable cause. The issuing judge determined that it did, and, as noted above, this court agrees.

## II. Good-Faith Exception to the Exclusionary Rule

The Fourth Amendment's exclusionary rule does not bar the use of evidence obtained by police officers acting in good faith and with reasonable reliance on a facially valid search warrant. *Leon*, 468 U.S. at 920-24. "The suppression of evidence obtained pursuant to a warrant should be ordered ... only in those unusual cases in which exclusion will further the purpose of the exclusionary rule." *Id.* at 918. The purpose of the exclusionary rule is to deter improper police conduct. Id. at 916. Where an officer acting in good-faith obtains a search warrant from a judge there is nothing improper to deter. *ld.* at 920-21. Therefore, if the court finds the warrant was deficient in some manner, then the warrant can be rescued by the good-faith exception. However, the good-faith exception does have its limitations. The exception cannot be applied when the following circumstances exist:

> (1) the magistrate judge issuing the warrant was misled by a deliberately or recklessly false affidavit; (2) the magistrate judge wholly abandoned his or her detached and neutral judicial role; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence

9

entirely unreasonable; or (4) the warrant was so facially deficient ... that the executing officers cannot reasonably presume it to be valid.

*Leon*, 468 U.S. at 923.

The defendant argues that there is an issue with the detached and neutral judicial role of the judge because he signed the three affidavits and warrants at the same time suggesting that the judge did not read the documents and could not have found probable cause. (Doc. 55 at 7.) However, the government points out that nothing suggests the issuing judge did not comprehensively review each of the documents submitted. The law does not require the judge to note how much time he has spent reviewing affidavits and warrants. The judge is to be given great deference in determining probable cause. *Artez*, 389 F.3d at 1111. No evidence supports the claim that the judge wholly abandoned his detached and neutral judicial role, the court finds that the good faith exception applies.

In her Supplemental Brief, Aikman argues that the presence of a duplicate page in the affidavit "is also significant." (Dkt. 67-1, at 2). She argues that the failure of the judge to notice the duplicate page demonstrates that the judge "simply acted as a rubber stamp," since "he would certainly have called attention to the duplicate page." (*Id.*) This is, of course, pure speculation. The judge may have noticed a duplicate page in the affidavit, but decided the matter was too trivial to warrant comment, let alone delaying the execution of a search warrant seeking evidence of a highly perishable nature. The mere presence of a duplicate page in the affidavit is insufficient for concluding the judge departed from his role as a neutral and detached magistrate.

The defendant also argues that the third and fourth limitations apply because the affidavit is lacking in probable cause. She first argues it was unreasonable for a judge to find the affidavit supported a finding of probable cause as noted above. (Doc. 55 at 7.) She then argues that the warrant is defective and the defects should have been clear to a reviewing judicial officer. This argument is not persuasive because the affidavit does supply probable cause. Even if it did not, it

is far from the sort of glaringly deficient set of facts which would render the acceptance of the affidavit "wholly unreasonable."

**III. Vehicle Search**

Law enforcement searched the defendant's green Subaru, which was parked in the lawn area adjacent to the residence when they executed the warrant on the 919 Hachmeister residence. The defendant argues without authority that because the warrant did not refer to the vehicle, evidence found in the vehicle should be suppressed. Here, the car was within the curtilage of the residence, and it was proper for the officers to search the automobile. In *United States v. Finnigin*, 113 F.3d 1182, 1186 (10th Cir.1997) (citing *United States v. Sturmoski*, 971 F.2d 452, 458 (10th Cir. 1992)), the Tenth Circuit upheld the search of vehicles not specified in warrant but found within curtilage of residence.

**IV. Limitations of K.S.A. § 22-2503 on Magistrate Judges**

Aikman asserts that the warrant is invalid because an Osborne County judge did not sign it. (Doc. 55 at 1-2). She suggests that "[t]here does not appear to be any authority" for out-of-district warrant authorization. (Dkt. 64 at 4). The Kansas District Court Judge who signed the warrant is from the 23rd Judicial District which encompasses four counties in Kansas: Ellis, Gove, Rooks, and Trego. The city of Natoma is in neighboring Osborne County, which is in the 17th Kansas Judicial District.

There is in fact authority supporting such out-of-district warrants. The only authority Aikeman cites to the contrary, K.S.A. § 22-2503, provides that "[s]earch warrants issued by a district *magistrate* judge may be executed only within the judicial district in which said judge resides or within the judicial district said judge has been assigned." (Emphasis added). *See State v. Rupnick*, 280 Kan. 720, 733, 125 P.3d 541 (2005). The statute does not limit the geographic reach of warrants issued by district judges. The warrant here was executed by a district judge, not a district magistrate judge.

"A search warrant issued by a district judge may be executed anywhere within the state" *State v. Sodders*, 255 Kan. 79, 87, 872 P.2d 736 (l994) (Locket, J., dissenting).[3] This court has adopted a similar view. Judge Lungstrum rejected a similar argument in *Lord v. City of Leavenworth*, No. 08-2171-JWL, 2009 WL 129367, *4 (D.Kan., Jan. 20, 2009), noting "the issuing judge of the warrant here is a district judge – not a district magistrate judge, and therefore, there is no such limit on the territorial scope of this warrant."

---

[3] *Sodders*, held that the statute governing the geographic reach of Kansas police departments, K.S.A. 22-2401a, controlled over the statute governing the issuance of search warrants, K.S.A. 22-2505. As recognized in *State v. Mendez*, 275 Kan. 412, 418, 86 P.3d 811 (2003), a new statute superseded *Sodders*.

13

IT IS ACCORDINGLY ORDERED this 1st day of February, 2010, that the defendant's Motion to Supplement (Dkt. 67) is granted; her Motion to Suppress (Dkt. 54) is hereby denied.

 s/ J. Thomas Marten     
J. THOMAS MARTEN, JUDGE